IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                  CR No.  09-2963 LH

ALEX MAESTAS,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Alex Maestas' Request for Conditions of Release Pending Appeal (Doc. 48). The Court, having reviewed the motion, the briefs, evidence, and the relevant law, concludes that the motion should be denied.

**I.   BACKGROUND**

On November 19, 2009, a federal grand jury returned a two-count Superseding Indictment charging Defendant Maestas with theft of government property in violation of 18 U.S.C. § 641 (Count 1) and with theft of nuclear material in violation of 18 U.S.C. § 831. (Superseding Indictment (Doc. 11).) On January 28, 2010, Defendant Maestas entered into a Plea Agreement whereby he pled guilty to Count 1 of the Superseding Indictment and the United States agreed to dismiss Count 2. (*See* Plea Agreement (Doc. 20) ¶¶ 3, 12.) Specifically, Defendant Maestas admitted the following:

> On or about March 24, 2009, in Los Alamos County in the District of New Mexico, I wilfully and knowingly stole, purloined, concealed, received and converted to my own use property and a thing of value of the United States, specifically, gold, belonging to the Los Alamos National Laboratory and valued at approximately $2,000. I knew the gold was taken from an area that was used to store materials that contained plutonium and nuclear material.

(*Id.* ¶ 8.) The terms of the Plea Agreement also permitted the United States and Defendant to

"present evidence and make arguments for or against applicability of the enhancement set forth at U.S.S.G. § 2B[]1.1(b)(13)." (*Id.* ¶ 10(b).) Section 2B1.1(b)(13) of the United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") recommends that, if the offense involving stolen property involved "the conscious or reckless risk of death or serious bodily injury," increase by 2 levels, and if the resulting offense level is less than level 14, increase to level 14. U.S.S.G. § 2B1.1(b)(13).

The Pre-sentence Report ("PSR") noted, based on an interview with a Radiation Specialist of the New Mexico Department of Health, that a piece of gold with approximately 0.10 grams of plutonium incorporated in it would be a "serious contamination source" that would emit alpha particles that could change the molecular structure of a person's DNA and "run a very serious risk" of causing cancer in a person exposed to the alpha particle contamination and of eventually dying a slow, painful death. (*See* PSR 5-6.) The PSR recommended that the § 2B1.1(b)(13) enhancement be applied because, based on Defendant's approximately 12 years of employment at Los Alamos National Laboratory ("LANL"), he had knowledge of the potential health risks associated with exposure to the radioactive contaminated piece of gold he attempted to steal. (*See id.* at 7.) After adjusting for Defendant's acceptance of responsibility and with a criminal history category of I, the PSR recommended a total offense level of 12, resulting in a guideline imprisonment range of 10 to 16 months. (*See id.* 7-8, 12.)

On August 17, 2010, the United States filed a Sentencing Memorandum, concurring with the application of the § 2B1.1(b)(13) enhancement. (*See* United States' Sentencing Mem. (Doc. 28).) The United States attached evidence that a few millionths of a gram of plutonium delivered through the lungs, liver, or bones when inhaled, ingested, or passed into the blood stream through a wound, "may increase the risk for developing cancer in those organs." (*Id.*, Ex. 1 (Doc. 28-1) at 5.) The

2

United States also submitted evidence that "[a]irborne, soluble chemical compounds of plutonium are considered so dangerous by the Department of Energy (DOE) that the maximum permissible occupational concentration in air is an infinitesimal 32 trillionths of a gram per cubit meter!" (*Id.*)

Defendant objected to application of the enhancement, arguing for a base offense level of six and an overall sentencing range of zero to six months. (*See* Def.'s Objections to the PSR (Doc. 29) ¶ 9.) Defendant argued that, prior to leaving the laboratory, he checked the gold using a radioactive scanning device to determine if the gold contained any radioactive material. (*Id*. ¶ 2.) Defendant thus contended that, although he knew the gold came from an area where radioactive materials were stored, he did not know the gold in his possession contained radioactive materials. (*Id.*) Defendant therefore argued that he was not consciously aware that the gold was radioactive or that taking it would risk death or seriously bodily injury to others. (*Id.*) In addition, Defendant cited other portions of Government's Exhibit 1 that downplay the health risks of plutonium exposure. (*See, e.g.,* ¶ 5(a) ("'. . . the penetration power of alpha particles is limited. A mere sheet of paper or the other layers of our skin will block their passages. . . To be harmful, alpha emitters have to be inside the body' . . . Page 43"); ¶ 5(b) ("'It is important to remember that, because their power of penetration is limited, alpha emitters are hazardous to human health only when they have found their way into the body. When inhaled, ingested, or passed into the blood stream through a wound, plutonium deposits in the lung, liver or bones.' . . . Page 44"); ¶ 5(d) ("'Because the levels of plutonium exposure have been kept extremely low, even cancer cannot be linked to such exposure with any certainty in epidemiological studies.' . . . Page 44").)

On August 31, 2010, this Court held a sentencing hearing. Defendant objected to the probation officer's reliance on one interview with a specialist from the State of New Mexico, rather than on experts from LANL or other studies that indicate that the information conveyed in the PSR

was misleading and false regarding the dangers of plutonium. (*See* Sentencing Hearing Tr. (Doc. 43) 5:11-6:12.) Defendant urged the Court to rely on an interview with Paul Hoover, a technical adviser to the Radiological Protection Division at LANL, who emphasized that plutonium is an internal contamination hazard. (*Id.* 11:7-19.) Mr. Hoover explained that the emphasis on radiation protection in the area Defendant worked is alpha radiation, the primary radiation hazard associated with plutonium 239, so that it was plausible that Defendant might not have been aware the gold would have emitted small amounts of other forms of radiation that were detectable by the personal contamination monitor. (*Id.* 12:1-8.)

The Court considered Defendant's arguments, but rejected their significance. The Court noted that persons subsequently exposed to the gold Defendant attempted to steal would not have known to be careful not to handle the gold in such a way to ensure he or she did not inhale, ingest, or expose a wound to the gold. Consequently, the limited ways of danger from plutonium exposure continued to pose a danger to other persons.

The Court also found convincing the evidence indicating that Defendant knew of or was aware of the risk posed by the gold's danger. For instance, the evidence showed that Defendant went to work in a highly secure area with extensive security. (*See id.* 19:23-20:13; 21:17-22:3.) The contaminated materials were contained in glove boxes that used thick rubber gloves to separate the worker from direct contact with the contaminated materials. (*See id.* 20:14-21:11 & Government's Ex. 3.) When Defendant would leave the facility, he would first be checked for radiation contamination on a hand-and-foot monitor. (*See id.* 21:12-15 & Government's Ex. 4.) When the personnel contamination monitor alarm tripped when Defendant was exiting with the gold, Defendant reported that it might be what he was holding in his hand. (*See* Tr. 22:16-21.) That gold was wrapped in yellow duct tape, which is used to mark materials that are presumed to be

contaminated with radiation.  (*Id.* 22:21-25 & Government's Ex. 5.)  Defendant admitted to LANL personnel that he knew that he did not follow the proper procedure to remove an item and that he knew that something wrapped in yellow tape indicates that it needs to be surveyed by the radiation control technicians for release before removing the item.  (*See* Tr. 25:7-26:2 & Government's Ex. 13.)  Mr. Hoover also stated that, the day after the theft of the gold, the supposedly non-radioactive waste from the room was collected and proved to be contaminated with plutonium and americium in the same proportion as that which contaminated the gold.  (*See* Tr. 30:11-22 & Government's Ex. 14 at 3.)  Mr. Hoover opined that the evidence indicates that Defendant attempted to decontaminate something that had been exposed to the gold and then disposed of the materials he used to do the contamination in the clean waste.  (*See* Tr. 30:11-22 & Government's Ex. 14 at 3.)  Mr. Hoover stated that the Annual Limit on Intake, the legal safe exposure limit, for plutonium is 18,000 disintegrations per minute ("dpm") (*See* Tr. 30:23-31:17 & Government's Ex. 14 at 1-2.)  The removable contamination on the surface of the gold piece tested at 8.5 million dpm, far in excess of the ALI safe levels.  (*See* Tr. 32:5-19 & Government's Exhibit 15.)

Mr. Hoover also stated in his interview that, if all of the 0.1 g of plutonium in the gold was incorporated within the gold, the potential health risks to anyone exposed to that gold are minimal and the exposed person would be unlikely to receive an ALI radiation dose, because a minimal number of plutonium molecules would be present on the outer surface of the gold and a person handling it would not ingest or inhale any plutonium.  (*See* Government's Ex. 14 at 2.)  At the time Mr. Hoover made this statement, however, the gold had not yet been retested to determine the exact radiation levels.  (*See* Tr. 32:5-9.)  Mr. Hoover admitted that the potential health risks are unclear if the gold were sold to a gold buyer and melted down or worked into jewelry.  (*See* Government's Ex. 14 at 2-3.)  He acknowledged that processing the gold could result in a significant amount of

5

plutonium being aerosolized and released in the air or causing incorporated plutonium to come to the surface.  (*See id.*)

After hearing all the evidence, the Court concluded that the § 2B1.1(b)(13) enhancement should be applied because the evidence and the Plea Agreement demonstrated that Defendant knew that there was a substantial risk of radioactive danger to any person who might be exposed to this material and that he attempted to steal it in spite of that knowledge, showing a reckless risk of death or serious bodily injury to others.  The Court sentenced Defendant to a term of imprisonment of 12 months and one day.  On September 7, 2010, Defendant filed a Notice of Appeal (Doc. 34). Defendant asserts that the sole issue he intends to raise on appeal is the application of the § 2B1.1(b)(13) sentencing enhancement.  (*See* Def.'s Request for Conditions of Release Pending Appeal (Doc. 48) at 2.)

## II.   DISCUSSION

Section 3143 of Title 18 of the United States Code provides that the court "shall" detain a convicted criminal defendant pending appeal unless the court finds "(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community . . . and (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in" reversal, an order for new trial, a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.  18 U.S.C. § 3143(b)(1)(A)-(B).  The Tenth Circuit has drawn a distinction between the burden of proof a defendant must meet to prove § 3143(b)(1)(A), which requires clear and convincing evidence that a defendant is not a flight risk or danger to the community, and § 3143(b)(1)(B), which requires the defendant prove by a preponderance of the evidence that the appeal is not for purpose of delay, the

appeal raises a substantial question of law or fact, and if that substantial question is determined favorably to defendant on appeal, the decision is likely to result in reversal or an order for a new trial. *See United States v. Meyers*, 95 F.3d 1475, 1489 (10th Cir. 1996).

The Government does not contest that Defendant is not likely to flee or that he does not pose a danger to the community. Instead, the only question at issue is whether the appeal raises a substantial question of law or fact that is likely to result in reversal.

To determine whether a defendant has satisfied the requirements of § 3143(b)(1), the court must make two determinations. *See United States v. Affleck*, 765 F.2d 944, 952 (10th Cir. 1985). First, the court must decide if the appeal raises a "substantial" question of law or fact. *Id.* (citing *United States v. Miller*, 753 F.2d 19, 24 (3d Cir. 1985)). Second, the court must determine, if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed. *Id.* As for the first prong, a "substantial question" is a close question or one that could very well be decided the other way. *Id.* (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)). In determining whether a district court properly considered the applicable guidelines range in calculating a sentence, the Tenth Circuit reviews the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006). The second prong involves a determination of whether the question of law or fact is harmless, will have no prejudicial effect, or was insufficiently preserved. *Affleck*, 765 F.2d at 953 (quoting *Miller*, 753 F.2d at 23).

After re-examining the record, the Court concludes that Defendant has not shown that the question of law or fact presented on appeal is "substantial." As detailed above, the Court had a significant factual basis for imposing the § 2B1.1(b)(13) enhancement and finding that the offense

involved "the conscious or reckless risk of death or serious bodily injury." The Court concludes that the factual issue is not a close question or one that would likely be decided the other way. *Cf. United States v. Mateos*, __ F.3d __, 2010 WL 4068876, *18 (11th Cir. 2010) (holding that district court did not clearly err in applying U.S.S.G. § 2B1.1(b)(13)(A) enhancement, even though there was no evidence that any patient was actually harmed from treatments, because the Guidelines provision focuses on defendant's disregard of risk rather than on result and the district court found that defendant knew or recklessly disregarded the severe risks associated with giving HIV-positive patients unnecessary treatments because a trained nurse like defendant would be well aware that any injection always carries some risk of infection or other complications, a risk that is especially high when patients have HIV and weakened immune systems). Application of that enhancement, after adjusting for his acceptance of responsibility, resulted in a guideline sentencing range of 10-16 months. The Court, after carefully considering all 18 U.S.C. § 3553(a) factors, imposed a sentence at the lower end of that range and far below the statutory maximum sentence under 18 U.S.C. § 641. The Court therefore also concludes that there is no close legal question concerning the applicability of U.S.S.G. § 2B1.1(b)(13) or to the overall sentence imposed. Defendant has simply not met his burden to show that his case presents substantial issues for the Tenth Circuit or that the Tenth Circuit would reverse and require imposition of a lesser sentence that would allow the Court to release him under the standards set forth in *Affleck*.

**IT IS THEREFORE ORDERED** that Defendant Alex Maestas' Request for Conditions of Release Pending Appeal (**Doc. 48**) is **DENIED**.

_____
SENIOR UNITED STATES DISTRICT JUDGE